UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
KIMBERLY CORBETT,

                      Plaintiff,                 **MEMORANDUM & ORDER**
                                                                              17-CV-1109 (PKC)

    – against –

COMMISSIONER OF SOCIAL SECURITY,

                      Defendant.
----------------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

Plaintiff Kimberly Corbett ("Plaintiff") brings this action under 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration's ("SSA") denial of her claim for Disability Insurance Benefits ("DIB"). The parties have cross-moved for judgment on the pleadings. (Dkt. 8, 11.) Plaintiff seeks reversal of the Commissioner's decision and an immediate award of benefits, or alternatively, remand for further administrative proceedings. The Commissioner seeks affirmation of the denial of Plaintiff's claims. For the reasons set forth below, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion.

## BACKGROUND

**I. PROCEDURAL HISTORY**

On May 6, 2013, Plaintiff filed an application for DIB, claiming that she had been disabled since February 1, 2011. (Tr. 18.)[1] The claim was initially denied on September 5, 2013. (*Id.*) After her claim was denied, Plaintiff requested and appeared for a hearing before an administrative law judge ("ALJ") on June 17, 2015. (*Id.*) By decision dated July 15, 2015, ALJ James Kearns found that Plaintiff was not disabled within the meaning of the Social Security Act from February

---

[1] All references to "Tr." refer to the consecutively paginated Administrative Transcript.

1, 2011, her alleged onset date, through the date of the ALJ's decision.[2] (Tr. 18-30.) On August 17, 2015, Plaintiff requested a review of the decision by ALJ Kearns (Tr. 12) and the Appeals Council denied the request for review on January 13, 2017 (Tr. 1-4). Based upon this denial, Plaintiff timely filed this action seeking reversal or remand of ALJ Kearns's July 15, 2015 decision.

## II. STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Social Security Act (the "Act") may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits. 42 U.S.C. § 405(g). In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quotation omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (alterations and internal quotation marks omitted)). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (quotation omitted). However, "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If there is substantial evidence in the record to support the

---

[2] Generally, the ALJ considers whether the claimant was disabled through the date the claimant last met the insured status requirements of Title II of the Social Security Act. In this case, however, Plaintiff met the insured status requirement until December 31, 2015. (Tr. 20.)

Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013).

## III.  ELIGIBILITY STANDARD FOR SOCIAL SECURITY DISABILITY BENEFITS

To receive DIB, claimants must be disabled within the meaning of the Act. Claimants establish disability status by demonstrating an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3). The claimant bears the initial burden of proof on disability status and must demonstrate disability status by presenting medical signs and findings, established by "medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. §§ 423(d)(5)(A), 1382c(a)(3)(D). However, the ALJ has an affirmative obligation to develop the administrative record. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009). This means that the ALJ must seek additional evidence or clarification when the claimant's medical reports contain conflicts or ambiguities, if the reports do not contain all necessary information, or if the reports lack medically acceptable clinic and laboratory diagnostic techniques. *Demera v. Astrue*, No. 12 Civ. 432(FB), 2013 WL 391006, at *3 (E.D.N.Y. Jan. 24, 2013); *Mantovani v. Astrue*, No. 09 Civ. 3957(RRM), 2011 WL 1304148, at *3 (E.D.N.Y. Mar. 31, 2011).

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The claimant bears the burden of proof in the first four steps in the inquiry; the Commissioner bears the burden in the final step. *Talavera*, 697 F.3d at 151. First, the ALJ determines whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the answer is yes, the claimant is not disabled. If the claimant is not engaged in "substantial gainful activity,"

3

the ALJ proceeds to the second step to determine whether the claimant suffers from a "severe impairment." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is determined to be severe when it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the impairment is not severe, then the claimant is not disabled within the meaning of the Act. However, if the impairment is severe, the ALJ proceeds to the third step, which considers whether the impairment meets or equals one of the impairments listed in the Act's regulations (the "Listings"). 20 CFR § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the ALJ determines at step three that the claimant has one of the listed impairments, then the ALJ will find that the claimant is disabled under the Act. On the other hand, if the claimant does not have a listed impairment, the ALJ must determine the claimant's "residual functional capacity" ("RFC") before continuing with steps four and five. The claimant's RFC is an assessment which considers the claimant's "impairment(s), and any related symptoms . . . [which] may cause physical and mental limitations that affect what [the claimant] can do in the work setting." 20 C.F.R. § 404.1545(a)(1). The ALJ will then use the RFC determination in step four to determine if the claimant can perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the answer is yes, the claimant is not disabled. Otherwise the ALJ will proceed to step five where the Commissioner then must determine whether the claimant, given the claimant's RFC, age, education, and work experience, has the capacity to perform other substantial gainful work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the answer is yes, the claimant is not disabled; otherwise the claimant is disabled and is entitled to benefits. *Id.*

## IV.  RELEVANT FACTS AND MEDICAL RECORDS

From May 1991 until March 2006, Plaintiff was employed as a corrections officer. (Tr. 133, 148.) Between May 2008 and April 2010, she worked as a laboratory assistant. (*Id.*)

4

In the SSA's initial disability report, filed on May 24, 2013, Plaintiff reported that she stopped working due to "off/on back pain", a pulmonary embolism, depression, and herniated and bulging discs causing nerve root compression.[3] (Tr. 112-13, 128, 132.) In her function report, dated June 12, 2013, she stated that her typical day included waking her children up for school, occasionally doing laundry and cooking, and going to doctors' appointments. (Tr. 139, 141, 143.) Plaintiff reported that she did not leave her home other than to go to appointments or do grocery shopping, but spoke to people on the phone "[e]veryday often." (Tr. 141, 143.) Additionally, she said that, at times, she had trouble remembering things or focusing and that "[w]hen stress hit[] [her she does not] sleep." (Tr. 146.) She also stated, "[t]he changes my body has endured, keeps me from working to provide for my family. That inability makes it more stressful." (*Id.*)

Dr. Sally Morcos conducted a consultative psychiatric evaluation of Plaintiff on August 1, 2013. (Tr. 229-32.) Plaintiff stated that she was "currently unable to work due to continuous back pain and discomfort, as well as shortness of breath and heart palpitations." (Tr. 229.) She "denied any psychiatric hospitalizations or history of outpatient mental health treatment", but said that she "has always been the breadwinner in her home, and now she has difficulty coping with being [unemployed and] unable to take care of her [three] children and letting them down." (*Id.*) She also reported "dysphoric mood and social withdrawal." (Tr. 229-30.) Dr. Morcos noted that Plaintiff was "cooperative and presented with adequate social skills," was "[c]oherent and goal directed," and had a neutral mood, full affect, and average intellectual functioning. (Tr. 230-31.)

---

[3] Plaintiff's physical ailments include hypertension, chronic tachycardia, and obesity. (Tr. 20.) Due to the grounds on which Plaintiff appeals, the Court recites only those aspects of Plaintiff's medical history that are relevant to resolving the pending motions. Notably, Plaintiff does not base her appeal on any physical impairments. (*See* Tr. 42 (Plaintiff's attorney stating, "my theory, based on the records . . . is psych"); Plaintiff's Brief ("Pl.'s Br."), Dkt. 8-1, at ECF 3 n.2.).

Plaintiff indicated that she had friends to whom she spoke, but no emotionally supportive family relationships. She stated that "if she has a good day, she may sit outside with friends. If she does not have a good day, she will sit inside the home." (Tr. 231.)

Dr. Morcos diagnosed Plaintiff with "adjustment disorder with depressed mood" and recommended psychological therapy, as well as medical follow-up. (Tr. 232.) She stated that Plaintiff's prognosis was "[f]air, given the claimant's ability to engage in daily activities." (*Id.*) According to Dr. Morcos's medical source statement:

> The claimant did not evidence limitation following and understanding simple directions and instructions, performing simple tasks independently, maintaining attention and concentration, maintaining a regular schedule, learning new tasks, performing complex tasks independently, or making appropriate decisions. She demonstrated moderate limitations relating adequately with others and appropriately dealing with stress. Difficulties are caused by pain and poor coping skills. The results of the evaluation appear to be consistent with psychiatric problems, but in itself does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis.

(Tr. 231-32.)

Plaintiff's claim was initially denied on September 5, 2013. (Tr. 18.) The SSA found that even though Plaintiff claimed that she was disabled, in part, due to depression, "[t]he reports did not show any conditions of a nature that would prevent [her] from working." (Tr. 70.) Additionally, the SSA found that Plaintiff had "non severe" affective disorders, including mild restrictions in daily living, mild difficulty in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 58-59.) On October 11, 2013, Plaintiff requested an administrative hearing. (Tr. 18.)

On November 10, 2013, Plaintiff went to Dr. Quazi Rahman for a psychiatric evaluation. (Tr. 275-79.) Plaintiff had a constricted affect and reported a depressed mood, low energy level, lethargy, sleep disturbance, appetite disturbance, and feelings of worthlessness. (Tr. 278.) She

6

noted that she had gone to the emergency room the prior week after a panic attack, but was not taking any psychotropic medication. (Defendant's Brief ("Def.'s Br."), Dkt. 12, at ECF 6.)[4,5] Dr. Rahman found that Plaintiff exhibited good judgment, concentration, insight, intellectual functioning, and impulse control. (Tr. 278.) He diagnosed "major depressive disorder, single episode, severe; and anxiety disorder, not otherwise specified," and assessed a global assessment of function ("GAF") of 55. (Def.'s Br. at 6-7.)[6] Dr. Rahman prescribed Zoloft and Trazadone. (*Id.*)

Plaintiff returned to Dr. Rahman on November 26, 2013, for medication management. (Tr. 273.) Dr. Rahman noted that Plaintiff was "still very depressed" with a constricted affect and sad and anxious mood. (*Id.*) He also found that she dressed appropriately, made good eye contact, exhibited cooperative and calm behavior, normal speech, and a logical/coherent thought process. (*Id.*) Dr. Rahman replaced Zoloft with Effexor. (*Id.*) Plaintiff saw Dr. Rahman again on December 24, 2013, where she reported that she had low self-esteem, was "still very depressed, does not go out[,] . . . [was] isolated", and could not sleep. (*Id.*) She had a constricted affect as well as a sad and anxious mood. (*Id.*) Dr. Rahman prescribed Ambien. (*Id.*) Plaintiff saw Dr. Rahman a third time on February 23, 2014, when she presented with a sad mood, but her mental status was otherwise unchanged. She denied any side effects from her medication. (Tr. 269.)

---

[4] Dr. Rahman and Dr. Camille Archer's treatment notes are often illegible; therefore, the Court relies on the Commissioner's brief where it cannot discern the records.

[5] The page numbers in the Commissioner's brief refer to the document's internal pagination.

[6] GAF is a rating of overall psychological functioning on a scale of 0 to 100. *See American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000) ("DSM-IV"). A GAF of between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* The American Psychiatric Association ("APA") discontinued use of the GAF for mental disorders in the DSM-V, published in 2013.

On April 23, 2014, Plaintiff saw Dr. Archer, a psychiatrist at the same office as Dr. Rahman, for an updated psychiatric assessment. Plaintiff stated that she "fe[lt] sad, fearful, low energy, low sleep[,] . . . low motivation, low concentration, [and] low appetite." (Tr. 266-67.) However, she denied feelings of hopelessness, helplessness, or worthlessness. She reported that her depression and anxiety had "worsened" since February 2014 due to the "[r]ecent stress of [her] husband leaving after 21 years of marriage. [Plaintiff] [r]eport[ed] anxiety, tension, [and] worrying [which] cause[d] irritability." (Tr. 267.) She exhibited a sad and anxious mood and a depressed and fearful affect with a GAF of 54. (*Id.*) She also reported that she had stopped taking Trazodone and Effexal, because there were not helpful, and Ambien, which was. (*Id.*) Dr. Archer prescribed Remeron for depression and anxiety. (*Id.*)

Plaintiff saw Dr. Archer again on May 14, 2014 for medication management. Plaintiff exhibited a constricted affect as well as a sad and anxious mood. (Tr. 264.) She stated that she was compliant with Remeron but her "depressive and anxiety symptoms [were] about the same." (*Id.*) Dr. Archer increased her dosage of Remeron. (*Id.*) On July 3, 2014, Plaintiff saw Dr. Archer for medication management and psychotherapy. Plaintiff reported having a sad mood due to "multiple stressors", having difficulty sleeping, and feeling "sadness, feeling frustrated." (Tr. 262.) She stated that the "most frustrating thing [was] that she [did not] get any sleep some nights." (*Id.*) Dr. Archer increased Plaintiff's Remeron dosage and prescribed Ambien for her poor sleep as "it helped in the past." (*Id.*) Plaintiff returned to Dr. Archer on August 20, 2014 for medication management. She stated that felt stable on her medication and reported an "ok" mood and had a constricted affect. (Tr. 260.) On September 14, 2014, Plaintiff saw Dr. Archer for psychotherapy as well as medication management. Plaintiff reported "less stressors over the past month. However, [she] still feels sad" and sometimes has difficulty sleeping. (Tr. 258.) Dr. Archer

increased Plaintiff's Remeron dosage to help the "depression and anxiety." (Tr. 259.) On October 2, 2014, Plaintiff reported to Dr. Archer that the "Remeron helped [her] mood, anxiety and sleep", that she had "[n]o acute stressors" and that her "health [was] stable." (Tr. 256.) She exhibited a euthymic mood and a full and appropriate affect. (*Id.*) Dr. Archer did not change Plaintiff's medication because Plaintiff was "doing better." (Tr. 257.)

On November 13, 2014, Plaintiff saw Dr. Archer for medication management and psychotherapy. Plaintiff reported that her "mood and anxiety [were] better", she had good sleep and appetite, but that she "[o]ccasionally ha[d] [a] reactive mood" and "frustrations." (Tr. 254.) Plaintiff's uncle had died the prior month, "but [she was] handling [it] well." (*Id*.) She exhibited a euthymic mood and a full and appropriate affect. (*Id.*) Plaintiff's medication remained unchanged. On December 11, 2014, Plaintiff saw Dr. Archer for medication management and psychotherapy. Plaintiff reported that, for the prior three weeks, she had "been feeling sad, unmotivated . . . [and a] lack of interest." (Tr. 252.) She also stated that she had trouble sleeping when she did not take Ambien. (*Id.*) She had a constricted affect and a sad mood. (*Id.*) On February 11, 2015, Plaintiff reported "multiple family stressors which ha[d] caused her to feel anxious and depressed over the past month" as well as "[s]adness, angry, helplessness . . . low energy, [and] anxious." (Tr. 250.) She exhibited a sad and anxious mood and an anxious affect. (*Id.*) Dr. Archer prescribed Paxil for Plaintiff's depression and anxiety. (*Id.*)

On March 19, 2015, Plaintiff reported feeling "calmer this month", that her "[a]nxiety ha[d] improved, and "[she] denie[d] depression." (Tr. 248.) She also "report[ed] being better able to handle stressors" and that the "[a]ddition of Paxil [was] helpful." (*Id*.) She had a full and appropriate affect and a euthymic mood. (*Id.*) Dr. Archer decreased Plaintiff's Remeron dosage. (Tr. 249.) On April 16, 2015, Plaintiff reported to Dr. Archer that she "still ha[d] some residual

9

depression & anxiety. . . . She ha[d] stressors, which [made] her frustrated. She mostly stay[ed] by herself, feel[ing] sad." (Tr. 246.) She had a constricted affect and a sad and anxious mood. (*Id.*) Dr. Archer increased Plaintiff's Paxil dosage. (*Id.*)

On May 28, 2015, Dr. Archer completed a medical source statement. (Tr. 280-82.) Dr. Archer indicated that Plaintiff had marked impairments in all areas, including: ability to understand, remember, carry out instructions, and interact with supervisors, co-workers, and the public. (Tr. 280-81.) However, Dr. Archer also stated that there was no medical evidence supporting her assessment because the clinic "does not perform tests", and that no other capabilities were affected by Plaintiff's impairment. (Tr. 281.)

On June 17, 2015, Plaintiff testified at her ALJ Hearing. (Tr. 40-48.) She stated that "stress" prevented her from working and that she "[c]an barely get up in the morning", she "cr[ies] on the drop of the dime," and has pain. (Tr. 41.) She testified that she could not work because "[r]ight now, I'm having a lot of fear. I think that's one of the things that's bothering me more than anything, is that I – I used to be able to protect my family, and these emotions, and cries, and outbursts, and different things that I'm feeling[.] This has just taken a toll on me because I've always been the sole provider and take care of my family, and right now, I'm not able to do so." (Tr. 48.) Plaintiff reported that she found her psychiatric medication helpful "[s]ometimes. Sometimes I don't like . . . the zoned feeling. I feel like I'm already not in control, so it makes me feel more out of control sometime[s]. And I don't like the feeling of not being able to control and, you know, take care of my family." (Tr. 44.) She stated that she went to a therapist "every [w]eek" and her doctor once a month unless there is a "need-to-basis in between the month." (Tr. 45.)

She described that, on a typical day,

[s]ometimes I can't get out of bed if it's not a doctor day or a therapy day. Even on those days that I have to go out, I can't wait to get home. Just all of my normal

> daily activities that I used to do, I can't anymore. And it makes me angry. Sometimes I don't even want to, you know, interact with my daughter. Like she's graduating, and she almost didn't graduate because I couldn't help her with her stuff. I usually try to get [my children] up in the morning, but from medication and not sleeping at night, we've up to, like, 65 latenesses[.]

(*Id.*) Furthermore, she stated that when her children are in school, she does "[n]othing. Absolutely nothing. I try reading and the lack of—reading wasn't there, the tension. I tried sewing, but my hands will cramp up on me, and nothing. Even T.V. I don't even watch the T.V. shows, I don't have interest to do much of anything." (Tr. 46.) She testified that her girlfriend and children did the cooking, cleaning, laundry, and shopping. (*Id.*)

## V. THE ALJ'S DECISION

The ALJ's July 15, 2015 decision followed the five-step evaluation process established by the SSA to determine whether an individual is disabled. (Tr. 18-30.) At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity since her alleged onset date (February 1, 2011). (Tr. 20.) At step two, the ALJ determined that Plaintiff suffered from hypertension, chronic tachycardia, obesity, adjustment disorder with depressed mood, major depressive disorder, and generalized anxiety disorder, which qualified as severe impairments. (*Id.*)

At step three, the ALJ determined that Plaintiff's impairments, either individually or in combination, did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 21-22.) In reaching this determination, the ALJ considered, *inter alia*, Listings 14.04 ("Affective Disorders"), 12.06 ("Anxiety-Related Disorders"), and 12.08 ("Personality Disorders"). (*Id.*) The ALJ found that Plaintiff had mild restrictions in daily living, moderate difficulties in social functioning, and moderate difficulties with regard to concentration, persistence, or pace, none of which were sufficient to establish the "marked limitations" or episodes of decompensation required to satisfy the relevant listings. (Tr. 21-23.)

Having determined that Plaintiff's impairment did not meet or medically equal any of the impairments in the Listings, the ALJ determined Plaintiff's RFC, finding that Plaintiff was able to perform "sedentary work" consisting of "simple and routine tasks" with only "occasional" contact with the public or co-workers. (Tr. 24.) The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (*Id.*) However, the ALJ found that the "claimant's allegations as to her mental symptoms are . . . not entirely consistent with her treatment history and resultant objective medical and psychological evidence." (Tr. 26.) The ALJ noted that Plaintiff did not receive any mental health treatment prior to November 2013, which "suggest[ed] that the claimant did not feel that her mental symptoms were so intense or so limiting prior to that time as to require treatment." (*Id.*) Additionally, the ALJ found that "claimant's stated activities of daily living" during her consultative examination "[were] not consistent with her alleged limitations, and detract[] from her credibility." (*Id.*) The ALJ gave Dr. Morcos's evaluation "great weight" because it was based "on a thorough examination of the claimant, and her opinion is consistent with the medical and psychological evidence of record." (Tr. 27.) By contrast, the ALJ gave Dr. Archer's medical source statement "little weight" because it was "present[ed] . . . without further explanation, and provide[d] no evidence for this drastic set of limitations." (Tr. 28 (noting that Dr. Archer's "clinic does not perform tests, which is fair enough, but she also provide[d] no other form of evidence for her opinion, such as her observations during treatment").) The ALJ also gave "little weight" to Plaintiff's GAF scores because they are no longer used by the DSM. (*Id.*)

At step four, the ALJ determined that Plaintiff is unable to perform any past relevant work. (Tr. 28-29.) However, the ALJ determined at step five, based on the vocational expert's testimony and Plaintiff's age, education, work experience, and RFC, that "there are jobs that exist in

significant numbers in the national economy that the claimant can perform." (Tr. 29-30.) The ALJ subsequently concluded that Plaintiff was not disabled from the alleged onset date (February 1, 2011) through the date of the ALJ's decision (July 15, 2015) as defined in the Social Security Act. (Tr. 30.)

**DISCUSSION**

Plaintiff argues that the ALJ erred in determining Plaintiff's RFC. First, Plaintiff argues that the ALJ should have "reached out to [Dr. Archer as the treating physician] for clarification or other input" if he "felt there [were] inconsistencies" in the treatment record or, alternatively, ordered a "pre-hearing or post-hearing consultative psychological examination." (Pl.'s Br. at 11.) Second, Plaintiff argues that the ALJ gave undue weight to Dr. Morcos's opinion despite the fact that her report was written two years before Dr. Archer's evaluation and before Plaintiff began psychotherapy. Third, Plaintiff argues that the ALJ put undue emphasis on Plaintiff's degree of daily activity. (*Id.* at 11-13.) For the reasons stated below, the Court finds that the ALJ failed to sufficiently develop the record to properly determine Plaintiff's RFC. Therefore, the Commissioner's decision is remanded.

First, the Court finds that the ALJ incorrectly rejected the limitations set forth in Dr. Archer's medical source opinion without making any attempt to determine the basis of that opinion. A treating physician's opinion is given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence" of record. 20 C.F.R. § 404.1527(c)(2). While the ALJ is correct that Dr. Archer herself noted that she had no clinical or laboratory test to support her medical source opinion because the clinic "does not perform tests" (Tr. 281)[7], and that Dr. Archer's

---

[7] It should be noted, however, that the record does not indicate that Dr. Morcos's consultative opinion was based on any clinical tests either. Furthermore, while Dr. Rahman, the

13

findings were internally inconsistent with her own treatment records (Def.'s Br. at 16-17), this does not end the inquiry. An ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). There was a "clear gap" between Dr. Archer's treatment notes and her medical report as to Plaintiff's vocational limitations. In such a situation, "if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from Dr. [Archer] *sua sponte.*" *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); *see also Hartnett v. Apfel,* 21 F.Supp.2d 217, 221 (E.D.N.Y. 1998) ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly[.]"); *cf. Peed v. Sullivan*, 778 F.Supp. 1241, 1246 (E.D.N.Y. 1991) ("What is valuable about the perspective of the treating physician—what distinguishes him [or her] from the examining physician and from the ALJ—is his [or her] opportunity to develop an informed opinion as to the physical status of a patient."). This is particularly true where the treating physician's opinion was consistent with Plaintiff's own symptoms about her limited ability to interact with others. (*See, e.g.*, Tr. 45 ("Sometimes I can't get out of bed if it's not a doctor day or a therapy day. Even on those days that I have to go out, I can't wait to get home. Just all of my normal daily activities that I used to do, I can't anymore."); Tr. 246 (Plaintiff reported "mostly stay[ing] by herself, feel[ing] sad.").) In this case, the ALJ should have sought an explanation from Dr. Archer as to the basis of her medical source opinion.

---

psychiatrist Plaintiff saw before Dr. Archer, conducted a GAF test indicating moderate difficulties in overall functioning—results that Dr. Archer noted in her April 23, 2014 examination of Plaintiff—the APA has discontinued use of the GAF for mental disorders in the DSM. Thus, it is unclear what, if any, medical or clinical significance there is to Dr. Archer's statement that her opinion was not based on any testing. That issue should have been resolved by the ALJ before disregarding, or according minimal weight to, Dr. Archer's opinion.

In the alternative, the ALJ could have sought another consultative examination for Plaintiff. *See Burger v. Astrue*, 282 F. App'x 883, 885 (2d Cir. 2008) ("Indeed, the relevant regulations specifically authorize the ALJ to pay for a consultative examination where necessary to ensure a developed record."). It was error, however, to give "great weight" to, and solely rely on, Dr. Morcos's November 2013 consultative examination. (Tr. 27.) While Dr. Morcos's opinion about Plaintiff's condition might have been accurate through August 1, 2013, it does not shed any light on Plaintiff's condition from August 2, 2013 through the date of the ALJ's decision. The ALJ was not entitled to draw his own medical conclusions about Plaintiff's RFC from August 2013 until July 2015 by extrapolating from Dr. Morcos's single consultative examination. *See Gross v. Astrue*, No. 12-CV-6207P, 2014 WL 1806779, at *18 (W.D.N.Y. May 7, 2014) (remanding where the ALJ determined Plaintiff's RFC "through her own interpretation of various MRIs and x-ray reports contained in the treatment records"); *see also Suide v. Astrue,* 371 F. App'x 684, 690 (7th Cir. 2010). The ALJ's approach in this case violated the rule that "[t]he ALJ is not permitted to substitute his [or her] own expertise or view of the medical proof for the treating physician's opinion" or a qualified expert. *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015); *see also Legall v. Colvin*, 13-CV-1426(VB), 2014 WL 4494753, at *4 (S.D.N.Y. Sept. 10, 2014) ("Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his [or her] own opinion for that of a physician, and has committed legal error.") (quoting *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F.Supp.2d 330, 347 (E.D.N.Y. 2010)).

Accordingly, this action is remanded for further development of the record and further proceedings consistent with this Order. *See Kercado v. Astrue*, No. 08 Civ. 478(GWG), 2008 WL 5093381, at *1 (S.D.N.Y. Dec. 3, 2008) ("It is well settled that the ALJ has an affirmative duty to

develop the record in a disability benefits case and that remand is appropriate where this duty is not discharged."); *accord Lamorey v. Barnhart*, 158 F. App'x 361, 362 (2d Cir. 2006) ("Generally, when an ALJ fails adequately to develop the record, we remand for further proceedings."); S.S.R. 16-3P, 2016 WL 1119029, at *4 (Mar. 16, 2016) ("We will not evaluate an individual's symptoms without making every reasonable effort to obtain a complete medical history unless the evidence supports a finding that the individual is disabled." (footnote omitted)).

## CONCLUSION

For the reasons set forth above, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. The Commissioner's decision is remanded for further consideration consistent with this Order. The Clerk of Court is respectfully requested to enter judgment and close this case.

SO ORDERED.

/s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: January 29, 2018
      Brooklyn, New York